**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 06-1370, 06-2535, 06-2536, 06-3043, 07-1525, 07-1526,
07-4618, 09-1827
_____

UNITED STATES OF AMERICA,

v.

AKHIL BANSAL,

> Appellant in Nos. 06-1370,
> 06-2535, 07-1525,

and

FREDERICK MULLINIX,

> Appellant in Nos. 06-2536,
> 06-3043, 07-1526,
> 07-4618, 09-1827.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-05-cr-00193-002/011)
District Judge: Hon. Paul S. Diamond
_____

Submitted under Third Circuit LAR 34.1(a)
October 27, 2011

Before: SLOVITER, GREENAWAY, JR. and ALDISERT,
<u>Circuit Judges</u>.

(Filed:  December 14, 2011)

Akhil Bansal (pro se)
Schuylkill FCI
P.O. Box 759
Minersville, PA 17954
        <u>Appellant</u>

Frederick Mullinix (pro se)
Federal Prison Camp
P.O. Box 3949
Pensacola, FL 32516
        <u>Appellant</u>

Raymond S. Sussman (on brief)
Law Office of Raymond S. Sussman
4523 Avenue H, First Floor
Brooklyn, NY 11234-1409
        <u>Counsel for Appellant Frederick Mullinix</u>

Zane David Memeger
Robert A. Zauzmer

Frank R. Costello
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
        Counsel for Appellee

_____

OPINION OF THE COURT
_____

ALDISERT, Circuit Judge.

Akhil Bansal and Frederick Mullinix appeal from their jury convictions in the United States District Court for the Eastern District of Pennsylvania on a 42-count indictment alleging crimes arising from their multi-national, internet-based, controlled-substance-distribution scheme. They have, in our estimation, challenged every decision of the District Court, at almost every moment of the litigation before, during, and after their convictions. Yet in the more than 1,100 pages of briefing submitted to us by both defendants and the government, we have identified not a single instance of reversible error. That the prior rulings and findings in this case have emerged from such an onslaught wholly intact represents no small achievement by the District Court, whose decisions we will affirm in all respects.[1]

_____

[1] We note at the outset that Bansal's and Mullinix's briefs raise approximately 75 issues for our consideration. Although the government responds by calling to our attention no fewer than 339 cases drawn from the span of more than 120 years (as well as 49 separate statutes and one book, for good meas-

I.

This case is about two defendants' convictions for illegal drug sales via websites purporting to be online pharmacies. From 2003 to 2005, Appellants Bansal and Mullinix imported controlled and noncontrolled substances from India, which they then advertised on the internet and distributed to customers in the United States via the mail without prescriptions. In 2006 the Appellants were charged under a 42-count indictment, tried, and convicted by a jury on all counts. This is their direct appeal.

Bansal, who lived in Philadelphia, supervised the domestic side of the multi-national controlled substance distribution conspiracy at issue in this case. He received bulk shipments of controlled substances from India, which he then stored, repackaged, and shipped directly to customers who ordered and paid for them online. He also oversaw the operation's finances and payment system, which he managed by opening on- and off-shore bank accounts, accepting payments from and delivering controlled substances to participating website operators, and transferring money between coconspirators and various banks.

Consumers were invited to purchase controlled substances through several of Mullinix's internet websites, the

_____

ure), we reject any implication that we should pick up their torch and embark upon a similar adventure ourselves. We address only those issues we deem worthy of discussion, and only to the extent we deem necessary to explain our reasoning.

4

most important of which was www.mymeds.com. Visitors to his websites simply chose the type, strength, and quantity of the drug they desired, paid with a credit card or online service such as PayPal, and awaited postal delivery to any address they provided. Between 2003 and 2005, approximately $1.3 million in proceeds from controlled substance sales flowed between Mullinix and Bansal.

Bansal, Mullinix, and many other coconspirators were indicted in April of 2005. Both of the Appellants here were arrested quickly—Mullinix apparently without incident, and Bansal as he attempted to flee the country the morning after his bank accounts were frozen. Bansal waived his <u>Miranda</u> rights, confessed to running an internet drug selling business, and admitted that he knew the operation was illegal. At approximately the same time as Bansal's arrest, federal agents executed search warrants upon at least two homes and a UPS store in New York, as well as two internet service providers in Mountain View, California. These searches produced approximately 450 gallons of contraband medication, as well as computer files and other records detailing the inner workings of the distribution operation.

Both Appellants hired and fired various attorneys throughout the course of their proceedings in the District Court. Ultimately, their cases proceeded to a jury trial and each was convicted on all counts alleged in their joint indictment. The convictions under that indictment, portions of which charged Bansal but not Mullinix, were:

> **Count 1:** Conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846.

**Count 2:** Conspiracy to import controlled substances, in violation of 21 U.S.C. § 963.

**Count 3:** Operation of a continuing criminal enterprise, in violation of 21 U.S.C. § 848 (Bansal only).

**Count 4:** Conspiracy to distribute misbranded substances, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2).

**Count 5:** Conspiracy to distribute controlled substances, in violation of 18 U.S.C. § 371.

**Count 6:** International travel and money transfers in furtherance of unlawful activity, in violation of 18 U.S.C. §§ 1952(a)(3) and 1957.

**Counts 7-10:** Money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) (Bansal only).

**Counts 11-13:** Monetary transactions in property derived from criminal activity, in violation of 18 U.S.C. § 1957.

**Counts 14-29:** Money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

**Counts 30-39:** Monetary transactions in property derived from criminal activity, in violation of 18 U.S.C. § 1957 (Bansal only).

**Counts 40-41:** Money laundering in violation of 18 U.S.C. § 1956 (a)(1)(A)(i) (Bansal only).

**Counts 42-44:** Monetary transactions in property derived from criminal activity, in violation of 18 U.S.C. § 1957 (Bansal only).

**Forfeiture:** Of all proceeds and property derived from the conspiracy to distribute controlled substances, pursuant to 21 U.S.C. §§ 853 and 970.

Upon their convictions, both Appellants filed this direct appeal, Mullinix through counsel and Bansal pro se. After briefing, Mullinix filed a motion seeking to proceed pro se as well, which we granted.

II.

7

The District Court had jurisdiction because the defendants were charged with offenses against the United States. See 18 U.S.C. § 3231. We have jurisdiction over its final judgments pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The relevant standard of review is set forth in each subsection below.

III.

For simplicity's sake, we rearrange and analyze Bansal's and Mullinix's most complex contentions in the following order. First, both Appellants contend that their money laundering convictions impermissibly merge with their underlying predicate felonies under United States v. Santos, 553 U.S. 507 (2008). Second, Bansal raises a host of issues related to his Continuing Criminal Enterprise ("CCE") conviction, concerning the indictment, the sufficiency of the evidence, and the jury instructions on that charge. Third, Bansal challenges the District Court's decision to suppress evidence obtained from untimely sealed surveillance records, on the ground that the government did not provide a satisfactory explanation for its seven- and ten-day delays in sealing the records. See United States v. Carson, 969 F.2d 1480 (3d Cir. 1992). Fourth, both Appellants allege a violation of Apprendi v. New Jersey, 530 U.S. 466 (2000), during sentencing. For the reasons set forth *infra* Part IV and V, we reject each of these contentions.

The remaining, more-frivolous contentions fall into two groups: shared arguments and those made by Bansal alone. Among the shared arguments, Appellants first challenge their conspiracy convictions under Counts One and Two of their indictment on the ground that the underlying

8

conduct the government alleged, distribution of controlled substances via the internet, was not illegal at the time they were charged. Next, they challenge their money laundering convictions on the related ground that they obtained the money laundered by lawful means. Third, they contend their convictions under Count One were misdemeanors and not felonies. For these reasons set forth *infra* Part VI, we will affirm the District Court with respect to each of the above issues.

Finally, Bansal alone raises a number of issues. First, he makes several contentions pertaining to the sufficiency of his indictment, the grand jury procedures in his case, and the voir dire procedures in empanelling his jury. Second, Bansal challenges the scope and sufficiency of the warrants by which evidence against him was obtained. Third, he challenges the sufficiency of the evidence supporting the jury's verdict of guilty with respect to his controlled substance distribution and importation charges. Fourth, he contends various items of evidence were admitted against him in violation of the Sixth Amendment's Confrontation Clause and the Federal Rules of Evidence. Fifth, he contends that various jury instructions misstated the law or directed a verdict for the prosecution. Finally, he alleges that prosecutorial misconduct and Brady violations mandate a new trial. We conclude, for the reasons *infra* Part VII, that all of these contentions are without merit. We therefore will affirm the District Court.

IV.

We must determine: (1) whether Appellants' money laundering convictions violated United States v. Santos, 553 U.S. 507 (2008); (2) with what specificity must the government list predicate offenses in an indictment to support a CCE

9

conviction after the Supreme Court's decision in Richardson v. United States, 526 U.S. 813 (1999); and (3) whether the government's mistake of fact constitutes a "satisfactory explanation" for its delay in sealing intercepted communications, pursuant to our decision in United States v. Carson, 969 F.2d 1480 (3d Cir. 1992). We ultimately side with the government and the District Court on each of these contentions, and will affirm the District Court's judgment.

A.

Bansal and Mullinix challenge their convictions under various federal money-laundering statutes, all of which prohibit concealing the source of "proceeds" from a criminal activity. See, e.g., 18 U.S.C. § 1956(a)(1)(A)(i). Appellants' specific contention is that their convictions are invalid for the reasons set forth in the plurality opinion in Santos, 553 U.S. 507. For the following reasons, we are not persuaded.

Whether the elements of a money laundering charge merge with the elements of the crime that generated the money to be laundered, and whether the "proceeds" laundered must be "profits" or "gross receipts," ordinarily are questions of law we review de novo. Cf. United States v. Yusuf, 536 F.3d 178, 185 (3d Cir. 2008). When these issues are not raised in the District Court, however, we limit our review to plain error only. See United States v. Albertson, 645 F.3d 191, 196 (3d Cir. 2011).

In Santos, the Supreme Court issued a 4-1-4 decision that appears to conclude that the word "proceeds," as used by 18 U.S.C. § 1956, refers to "profits" but not "gross receipts." Id. at 513-514. Santos can also be read, however, to support

the conclusion that proceeds means both "profits" and "gross receipts." Id. at 525 (Stevens, J. concurring). Bansal and Mullinix contend, at bottom, that the government failed to demonstrate that the money they were convicted of laundering was "profit," rather than "gross receipts," and that, as a result, their money laundering crimes merged with the crimes that produced the money. We disagree and will affirm.

A jury convicted Bansal and Mullinix under § 1956, which provides that a person is guilty of money laundering if he or she knowingly uses the proceeds of criminal activity to conduct a financial transaction designed in whole or part to conceal the nature, the location, the source, the ownership, or the control of the funds:

> Whoever knowing that the property involved in a financial transaction represents the *proceeds* of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the *proceeds* of specified unlawful activity—
>
> (A)
>
> > (i) with the intent to promote the carrying on of specified unlawful activity; or
> >
> > (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

> (B) knowing that the transaction is designed in whole or in part—
>
>> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the *proceeds* of specified unlawful activity; or
>>
>> (ii) to avoid a transaction reporting requirement under State or Federal law

18 U.S.C. § 1956(a)(1) (emphases added). Although the District Court denied Bansal's and Mullinix's general motions for a new trial, it did not rule on the money laundering claims because they did not raise them in their motion.

Bansal and Mullinix challenge their money laundering convictions on two grounds. First, they contend that because they were unaware that their behavior was criminal in 2006, they could not have been convicted of "knowing that the property involved in a financial transaction represent[ed] the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(1). Second, they cite Santos to challenge both the jury instructions and the sufficiency of the evidence supporting the jury's finding that the "proceeds" they laundered were "net profits" and not gross receipts. They contend that much of the money they were accused of laundering was used to pay for inventory, shipping costs, and other operating expenses, and that those transactions were part of running a drug operation in violation of the Controlled Substances Act, not money laundering.

The government responds in two ways. First, it reads the fractured decision in Santos to permit money laundering convictions for transactions involving "proceeds" that are used to pay operating expenses, and not just those proceeds that are net profit. In Santos, Justice Scalia, writing for four Justices, invoked the rule of lenity to conclude that "proceeds," as used in § 1956(a)(1), always means "profits." 553 U.S. at 513-514. Justice Alito, writing for a four-Justice dissent, would have held that "proceeds" means "gross receipts" and not merely net income or profits. Id. at 546 (Alito, J., dissenting). Justice Stevens, whose concurring opinion provided the fifth vote for Justice Scalia's judgment, concluded that if "proceeds" meant only gross receipts, then the government could charge money laundering in cases where the alleged laundering transaction was actually an ordinary part of the underlying criminal activity. See id. at 526-527 (Stevens, J., concurring). For example, in Santos, the defendant was convicted of illegal gambling and of laundering the profits by paying his employees and by paying the gambling winners. Id. at 509. In Justice Stevens' view, this created a merger problem because the elements of the laundering offense were also elements of the illegal gambling offense. See id. at 526-527. Justice Stevens went on to suggest that in cases that presented a "merger issue," the word "proceeds" should be construed to mean "profits" and not "gross receipts," but left open the question of whether, in other cases, a defendant could be convicted of laundering gross receipts. Id. at 525 ("[T]his Court need not pick a single definition of "proceeds" applicable to every unlawful activity . . . .").

Here, the government contends that Justice Stevens' opinion controls because it represents the narrowest ground

13

for the plurality decision. See Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (internal quotation omitted)). Relying upon Justice Stevens' opinion, the government urges us to affirm the convictions in this case because (1) in certain circumstances, "proceeds" may be illegally laundered if they are gross receipts (and not just net profits), and (2) the Appellants' case presents such circumstances because the "financial transaction" and "intent to conceal" elements do not merge with the elements of drug distribution. The government then cites cases from four other Courts of Appeals affirming money laundering convictions based upon financial transactions involving gross receipts of drug distribution. See Wilson v. Roy, 643 F.3d 433, 435 (5th Cir. 2011) (addressing the issue in an innocence claim raised by habeas petition); United States v. Quinones, 635 F.3d 590, 600 (2d Cir. 2011); United States v. Spencer, 592 F.3d 866, 880 (8th Cir. 2010); United States v. Demarest, 570 F.3d 1232, 1242 (11th Cir. 2009). Finally, the government contends that under our plain error standard of review, which we must apply because the defendants failed to raise this issue in their motions for a new trial, the unsettled state of the law precludes us from holding for the Appellants.

We agree with the government for the reasons that follow. As a threshold matter, we agree that, in the very narrow set of criminal cases arising from prescription-less sales of controlled substances via the internet, money laundering charges can apply to "gross receipts" of a criminal enterprise and not merely its profits. Cf. Quinones, 635 F.3d at 600 (2d

14

Cir. 2011) ("[W]e hold that 'proceeds' under 18 U.S.C. § 1956 is not limited to 'profits' at least where, as here, the predicate offense involves the sale of contraband.").

We agree also that our standard of review for this issue is plain error, but we reject the government's interpretation of that standard. The plain error standard of review asks whether "the District Court plainly erred in such a way as to affect the appellant's substantial rights." See Albertson, 645 F.3d at 196 (citing Rule 52(b), Federal Rules of Criminal Procedure). A ruling under the plain error standard thus turns upon an assessment of whether "the error . . . [was] prejudicial: It must have affected the outcome of the district court proceedings." United States v. Olano, 507 U.S. 725, 734 (1993). It does not, as the government implies, turn on the correct answer to a question of law. Whether the jury's verdict was plain error does not depend upon whether the current state of the law surrounding "proceeds" under § 1956 is confused and the Supreme Court's decision in Santos is confusing. Rather, the question we must ask is whether the evidence in this case supported the jury's findings pursuant to the essential elements of money laundering. For the following reasons, we conclude that it does.

A person is guilty of money laundering under § 1956 if he, (1) knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, (2) conducts or attempts to conduct such a financial transaction involving the proceeds of unlawful activity, (3) with either (a) the intent to promote the carrying on of specified unlawful activity; or (b) knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of

15

the *proceeds* of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law. See § 1956(a)(1).

Here, the jury could have found evidence for element (1) in the Appellants' intentional sale of morphine, ketamine, and steroids without prescriptions. Bansal and Mullinix contend that they could not have known that the proceeds from those sales were proceeds of illegal activity because they did not know that prescription-less internet drug sales were illegal. That contention misses the point. The elements of their crimes have nothing to do with the internet. They were convicted of prescription-less sales to customers within the United States—an activity that was clearly illegal at the time they were indicted. The jury could have inferred knowledge of that illegality from its findings that the defendants kept their bank accounts offshore, and that they conducted their sales only with the help of the internet and its relative anonymity. The jury's finding under element (2) was amply supported by its findings that the Appellants channeled money from one offshore account to another in what were clearly "financial transactions" within the meaning of § 1956(a)(1). Finally, the jury's finding under element (3) above was supported by its findings that the Appellants used their proceeds to purchase controlled substances (i.e., "to promote the carrying on of specified unlawful activity," § 1956(a)(1)(A)(1)), and possibly, to hide the location or source of the money they received from customers (i.e., to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds," § 1956(a)(1)(B)(i)). The jury could also have inferred that the reason the Appellants kept their accounts offshore was "to avoid a transaction reporting requirement under State or Federal law," § 1956(a)(1)(B)(ii). Because there was

16

evidence to support the jury's findings on the money laundering Counts, we will affirm the Appellants' convictions.

## B.

Bansal next challenges his CCE conviction on two fronts, contending that (1) his indictment insufficiently stated the elements of a CCE offense, and (2) his subsequent conviction was flawed due to improper jury instructions and insufficiency of the evidence. For the reasons that follow, we will affirm the District Court's judgment on all issues relating to Bansal's CCE charge.

### 1.

Bansal contends that his conviction under Count Three for conducting a Continuing Criminal Enterprise, see 21 U.S.C. § 848, should be vacated because the CCE count in his indictment (Count Four) did not state three separate felony offenses, and therefore did not properly state a CCE charge. The pertinent part of Bansal's indictment provided that he committed a CCE offense when he:

> violated one or more provisions of subchapter I of Chapter 13 of Title 21, United States Code, which are felonies, and such violations were part of a continuing series of violations of subchapter I of Chapter 13 of title 21, United States Code, including but not limited to, the offenses contained in Counts One and Two of this indictment, and the Overt Acts listed in this Indictment at paragraphs 1 through 42 of Count One of this indictment . . . .

17

Supp. App. 05011. In Bansal's view, his indictment should be dismissed because the language above does not allege three distinct violations of federal drug laws. We disagree and conclude that the CCE count in the indictment was sound.

"The 'sufficiency of an indictment to charge an offense is a legal question subject to plenary review.'" Yusuf, 536 F.3d at 184 (quoting United States v. Conley, 37 F.3d 970, 975 n.9 (3d Cir. 1994)).

To obtain a CCE conviction, the government must, in pertinent part, establish that the defendant's felonious acts are "part of a continuing series of violations." United States v. Grayson, 795 F.2d 278, 283-284 (3d Cir. 1986) (construing § 848(a)). The Supreme Court has held that the government must show that the defendant committed three separate predicate offenses to establish a "continuing series of violations." See Richardson, 526 U.S. at 815.

With regard to the sufficiency of a CCE indictment, we noted in United States v. Echeverri, 854 F.2d 638, 642 n.4 (3d Cir. 1988), that the government need not list in the indictment the three predicate offenses that would ultimately support a CCE conviction. Instead, we permitted the government "to rely upon all [criminal] activity, whether or not referred to in the indictment." Id.  In Richardson, however, the Supreme Court impliedly overruled the broadest reading of Echeverri. The Richardson Court held that a jury must find with specificity the predicate offenses to a CCE charge, and assumed without deciding that the necessary number of offenses was three. See 526 U.S. at 818-819. The Court reasoned that each predicate act constitutes an element of the offense. It necessarily follows, then, that, as elements of the of-

18

fense, each predicate act must appear in the indictment. Cf. id. at 826 (Kennedy, J., dissenting) (noting that the majority opinion means that indictments must specify predicate acts).

Although neither we nor the Supreme Court has elucidated the contours of precisely what must *appear* in a post-Richardson indictment, the Court of Appeals for the Second Circuit has, and we find its reasoning persuasive. In United States v. Flaharty, 295 F.3d 182 (2d Cir. 2002), the defendants contended that the indictment was deficient because it failed to specify which felonies within the indictment constituted the specific three felonies undergirding the CCE charge. Under the CCE count, the government had instead referred merely to vague "felony violations" of two criminal statutes, as well as to Counts One and Two, which charged a conspiracy to violate the same statutes. The Flaharty court construed Richardson to mean that although an indictment must contain three felonies that could support a CCE conviction, it need not specify which of those felonies will ultimately be used to maintain the CCE conviction. Id. at 197. This holding makes practical sense of Richardson's dicta, comports with a narrower reading of Echeverri, and maintains the purposes of an indictment by apprising a defendant "of the nature of the accusation against him." Russell v. United States, 369 U.S. 749, 766 (1962) (citation omitted).

Using the Flaharty court's reasoning to guide our analysis, we conclude that an indictment must include the facts and circumstances comprising at least three felonies, but that the CCE count itself need not identify with exacting specificity which three will ultimately prove the CCE charge. Incorporation by reference is sufficient. The indictment here, therefore, passes muster under Echeverri and Richardson. The

CCE count alleged that Bansal committed "a continuing series of violations of subchapter I of Chapter 13 of Title 21, United States Code, including but not limited to, the offenses contained in Counts One and Two of this indictment, and the Overt Acts listed in this indictment at paragraphs 1 through 42 of Count One of this indictment." Supp. App. 05011. The notion that the three CCE offenses need not be "limited to" the indictment is incorrect; as discussed above, the offenses must appear within the indictment. An evaluation of the indictment, however, reveals that the acts comprising the CCE charge—and, more importantly, the acts undergirding the jury's ultimate conviction—did indeed appear within it.

Count One (conspiracy to distribute controlled substances) and Count Two (conspiracy to import controlled substances) are inarguably separate felony offenses. See 21 U.S.C. §§ 846, 963. For the third felony, although neither the indictment nor the jury's verdict on the CCE count expressly states *which* act or acts made up the third CCE offense, the jury's unanimous guilty verdicts on Counts One, Two, Three, Four, and Five removed any doubt that the jury found that Bansal committed (at least) one additional subchapter-I felony that appeared in the indictment. Because the overinclusive language in the indictment did not affect the grand jury's decision nor the outcome of the trial, any such error was harmless. See United States v. Cotton, 535 U.S. 625, 634 (2002) (holding that defects in an indictment do not deprive a court or a petit jury of jurisdiction to ratify the indictment); Neder v. United States, 527 U.S. 1, 9, 15 (1999) (holding that errors that "do[] not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence" are subject to harmless error review); Arizona v. Fulminante, 499 U.S. 279, 306 (1991) ("[M]ost constitutional

20

errors can be harmless."); United States v. Mechanik, 475 U.S. 66, 70 (1986) (holding that a petit jury's guilty verdict made harmless a set of errors made in connection with the indictment); Russell, 369 U.S. at 763 ("Convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused." (quotation marks and citation omitted)).

The overbroad language in the indictment did not affect the outcome because the jury unanimously found Bansal guilty on Counts Four and Five. Although those Counts were brought under 18 U.S.C. § 371 (conspiracy to commit any offense against the United States), Bansal's guilt depended on the jury finding that he engaged in conspiracies in violation of subchapter I of Chapter 13 of Title 21. See Supp. App. 05012-05020. To reach its verdict, the jury was required to conclude that Bansal committed one or more Overt Acts listed in Count One in furtherance of these conspiracies.[2] See

---

[2] Specifically, the indictment alleged that Bansal conspired to: (1) "obtain substantial revenues and profits by illegally offering for sale and selling—without prescriptions—non-controlled prescription drugs, including [Sildenafil citrate (Viagra), Tadalafil (Cialis), Vardenafil (Levitra), Venlafaxine (Effexor XR), Carisoprodol (Soma), Sertraline (Zoloft), Tramdol (Ultram), Paroxetine (Paxil)], via internet websites and otherwise, by illegally importing and packaging those prescription drugs . . . . ," Supp. App. 05016 (Count Four), and (2) "obtain substantial revenues and profits by illegally offering for sale and selling—without prescriptions—controlled prescription drugs via internet websites and otherwise, by illegally importing and packaging those prescription drugs . . . . ," Supp. App. 05019 (Count Five).

Supp. App. 03394. Not only are the conspiracies alleged in Counts Four and Five themselves qualifying CCE felonies,[3] but any of the many Overt Acts that the jury could have found to sustain those Counts—Overt Acts 1, 2, 3, 5, 8, 9, 12, 15, 21, 23, 24, 25, 29, 33, 35, 38, 39, 41, and 42—independently violate Subchapter I.[4] Thus, by finding Bansal guilty of

[3] The elements that necessarily underlie these conspiracies appear in the indictment as Overt Acts. For example, a conviction on Count Four required the jury finding that Bansal committed some combination of Overt Acts 15, 21, 23, 29, and/or 35.

[4] Subchapter I makes felonious a dizzying array of activity, and each of the Overt Acts involving Bansal implicates some portion of that subchapter. Notably, 21 U.S.C. § 844 makes it felonious not only to (a) simply possess a controlled substance without a prescription, but also to (c) "conspir[e] to possess, distribute, manufacture, cultivate, sell or transfer any substance the possession of which is prohibited under this subchapter." See Supp. App. 04998-05007 (Overt Acts 1, 2, 3, 5, 8, 9, 21, 23, 24, 25, 41, 42). Section 841(a) similarly makes it unlawful "for any person knowingly or intentionally (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." See Supp. App. 04998-05007 (same). Section 841(c) makes it felonious to intend to evade the reporting requirements for these drugs—implicit in importing drugs with the intent to defraud the United States, as alleged in Counts Four and Five. See Supp. App. 05001 (Overt Act 15). Section 841(g)(1)(B) and (2)(A)(ii) makes it unlawful to import and sell ketamine (a date rape drug), specifically alleged in Count Five. See Supp. App. 05000, 05003, 05017 (Overt Acts 14, 23). Section 841(h) makes even emailing potentially felo-

22

Counts Four and Five, the jury inexorably found that Bansal committed a third drug felony under subchapter I that necessarily appeared in the indictment.

In short, Bansal had constitutionally sufficient notice of the "nature of the accusation[s] against him." Russell, 369 U.S. at 766. The indictment's reference to Overt Acts listed elsewhere within it—and the petit jury's subsequent conviction based on those Acts—satisfies Richardson and Flaharty's requirement that three predicate felonies appear in the indictment. Any erroneous clause pointing beyond the indictment was, because of the jury's findings, harmless. See, e.g., Me-

nious, so long as it involves using the internet to aid or abet the distribution of a controlled substance. Subparts (2)(C) ("serving as an agent, intermediary, or other entity that causes the Internet to be used to bring together a buyer and seller to engage in the dispensing of a controlled substance") and (E) are especially apt here. See Supp. App. 04999-5007 (Overt Acts 8, 12, 15, 21, 23, 24, 25, 29, 33, 35, 38, 39). Section 842 (a)(4) makes it unlawful to alter a label on a prescription drug. Section 842(a)(5) makes it felonious "to refuse or negligently fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under this subchapter or subchapter II of this chapter." See Supp. App. 05001 (Overt Act 15). Section 844(a) makes it "unlawful for any person knowingly or intentionally . . . (9) to distribute, import, or export a list I chemical without the registration required by this subchapter or subchapter II of this chapter." See Supp. App. 04998-05007 (Overt Acts 1, 2, 3, 5, 8, 9, 15, 21, 41, 42). Many of the above, moreover, are necessary prerequisites for a guilty verdict on Counts Four and Five.

23

chanik, 475 U.S. at 70 ("[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt."); Chapman v. California, 386 U.S. 18, 22 (1967) (noting that the harmless-error doctrine "block[s] setting aside [the defendant's conviction] for small errors or defects that have little, if any, likelihood of having changed the result of the trial"). Here, the jury's conclusions make apparent that neither the grand jury's charging decision nor the petit jury's conclusion would have changed whatsoever had the superfluous language in the indictment been omitted. We therefore will not disturb the District Court's judgment with regard to Bansal's indictment.

2.

Bansal raised a multitude of contentions with regard to the sufficiency of the evidence in this case, including three challenges of note relating to his CCE conviction. First, he contends that the jury did not sufficiently find three predicate felonies, which are essential to any CCE conviction. Second, he contends that the government failed to prove he managed five or more persons, as a CCE charge requires. Third, he challenges the jury instructions as incorrect. We disagree as to all three contentions and will affirm the CCE conviction.

To obtain a CCE conviction, the government must establish five material elements: "(1) a felony violation of the federal narcotics law, (2) as part of a continuing series of violations, (3) in concert with five or more persons, (4) for whom the defendant is an organizer or supervisor, (5) from which he derives substantial income or resources."

24

Grayson, 795 F.2d at 283-284 (3d Cir. 1986) (construing § 848(a)). As noted, the government must prove that the defendant committed three separate predicate offenses to establish the second element. See Richardson, 526 U.S. at 818. To prove the "organizer or supervisor" element, the government must prove that the defendant supervised or managed five or more people in furtherance of the CCE. Id. at 815-816 (quoting § 848(a)).

Bansal contends that the government did not produce evidence sufficient for the jury to find that he committed three predicate felonies in furtherance of a CCE, which the charge required. We disagree. As discussed above, Bansal's indictment described a laundry list of felonious conduct including his participation in organized, serial violations of controlled substances laws. The jury returned a unanimous guilty verdict supported by the evidence on every allegation in the indictment, including Counts Four and Five, and found that Bansal committed felonious Overt Acts listed in the indictment. The jury's unanimous finding as to these felonies was a sufficient basis for its conclusion that Bansal committed three predicate felonies in furtherance of his CCE offense.

Second, Bansal contends that the government failed to prove that he managed or supervised five or more persons, which a CCE charge requires. But the jury received testimony that Bansal: (1) hired coconspirator Richard Danby to be a "shipper" in furtherance of the CCE, see Supp. App. 00191-00193, 00411-00414, 00880-00890; (2) hired David and Elizabeth Armstrong to be "shippers" in furtherance of Bansal's CCE, see Supp. App. 00193, 00891-00895, 02730, 02500-02004; (3) directed codefendant Himanshu Kulshretha, who

25

carried out Bansal's instructions in India, see Supp. App. 00891-00895; and (4) appointed Sanjeev Shrivastav to take over operations at Bansal's distribution business while Bansal traveled to India, see Supp. App. 00893, 00906, 00915-00920. The testimony about these five individuals—and we note that the jury heard testimony regarding many more—was sufficient to support the jury's finding that Bansal managed or supervised five or more people.

Third, Bansal challenges the jury instructions in several discrete ways, none of which persuade us to disturb the District Court's judgment. For instance, Bansal contends that the District Court failed to charge the jury with instructions that it must be unanimous in its findings on each of the three predicate felonies supporting Bansal's CCE charge. But the District Court *did* instruct the jury that its finding must be unanimous. See Supp. App. 03387 ("You must unanimously agree on which three acts constitute the continuing series of violations."). We therefore reject this contention.

Bansal also appears to contend that the District Court erred by not instructing the jury to unanimously find and specify which individuals formed the basis of its conclusions on the CCE Count. We have rejected that argument and will not reconsider it here. See United States v. Jackson, 879 F.2d 85, 88 (3d Cir. 1989) (stating that unanimous agreement is not required as to the identity of the five or more persons supervised or managed pursuant to a CCE), vacated in part on other grounds by, 2000 WL 157172 (E.D. Pa. 2000).

Finally, Bansal challenges the District Court's instruction to the jury that the third offense may come from acts within the indictment or "acts not mentioned in the indictment

26

at all." Supp. App. 03387. Bansal did not object to the jury instructions at his trial, and consequently, we review his claim for plain error only. Albertson, 645 F.3d at 196. Although we now hold that acts not mentioned in the indictment cannot sustain a CCE conviction, the District Court's reliance on a broader reading of Echeverri was hardly plain error. Moreover, any error was harmless: the jury unanimously convicted Bansal on the CCE count for acts listed in the indictment. See Neder, 527 U.S. at 8-15.

We find no basis to reverse Bansal's CCE conviction on any grounds, and will therefore affirm the District Court's judgment in this respect.

## C.

Bansal next contends that various emails intercepted pursuant to two warrant-authorized wiretaps should have been suppressed because they were not immediately sealed upon the warrants' expiration pursuant to 18 U.S.C. § 2518(8)(a), which requires that the recordings of "[t]he contents of any wire, oral, or electronic communication" obtained pursuant to a search warrant be sealed "[i]mmediately upon the expiration of the period of the order." § 2518(8)(a). Violation of this statute requires suppression if the sealing was not "immediate" and if the government fails to provide any "satisfactory explanation for the delay." United States v. Ojeda Rios, 495 U.S. 257, 264-268 (1990). For the reasons that follow, we hold that the government's reasonable mistake of fact provided a satisfactory explanation for its delay, and we will affirm the District Court's decision not to suppress the communications on that ground.

27

The pertinent facts involve two delays. Bansal's intercepted emails were downloaded and copied to a laptop computer in Philadelphia. Both involved the Assistant United States Attorney's mistake of fact regarding when a CD containing the communications was available for sealing. In the first instance, this resulted in a seven-day delay before sealing. In the second, the initial delay was compounded by a great deal of confusion as to whether the computer containing the emails was functioning, as to who was to submit the CDs for sealing, and as to where the sealing order should be submitted (the supervising judge, who was also the emergency motions judge, was unavailable). This resulted in a ten-day delay before all copies of the CDs were sealed.

The District Court took testimony and concluded that the government's delay was excusable because the Assistant United States Attorney, who ultimately caused the delays, fully understood and intended to comply with the § 2518(8)(a) sealing requirement, and indeed believed that she had done so. See Supp. App. 04663-04664. It found that the delay was caused by her "mistaken understanding" and "a reasonable mistake." Supp. App. 04664. We review the District Court's denial of a motion to suppress for clear error as to the underlying factual findings, and we exercise plenary review of its application of the law to those facts. See United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002).

Because the District Court held, and the government concedes, that the sealing in this case was not immediate, the only issue before us on appeal is whether the government has offered a "satisfactory explanation" for its delay. In Carson, we held that a satisfactory explanation can be based on "objectively reasonable causes like understandable mistakes of

law and interference from unexpected, extrinsic events beyond the government's control." 969 F.2d at 1488. We went on to hold that the explanation must be the actual reason for the delay, and must "substantially correspond" to the explanation the government gave at the suppression hearing. Id. at 1492 (quoting Ojeda Rios, 495 U.S. at 264, 267). We did not, however, give abundant guidance as to what can constitute a satisfactory explanation. Indeed, although Carson's language expressly allows reasonable mistakes of law to provide a satisfactory explanation for a delay, it did not expressly state whether a reasonable mistake of fact—like the mistakes at issue here—can also provide a satisfactory explanation. Instead, we left the question open by stating that "satisfactory explanations for delays in sealing should relate directly to the practicalities of obtaining a sealing order," id. at 1498, without defining "practicalities" more specifically than as unforeseen emergencies—certainly graver than reasonable mistakes of fact, see id. We must determine, therefore, whether a reasonable mistake of fact can constitute a satisfactory explanation, and if so, whether the government's mistakes were reasonable. We answer both queries in the affirmative.

After reading Carson closely, we conclude that a reasonable mistake of fact must necessarily be sufficient to constitute a satisfactory explanation for the purposes of § 2518. In other arenas of criminal law, constitutional rights, and government conduct, we have long espoused the proposition that a mistake of fact is less culpable than a mistake of law. When judging criminal behavior, it is axiomatic that, although "ignorance of the law will not excuse," Shevlin-Carpenter Co. v. Minnesota, 218 U.S. 57, 68 (1910), a reasonable mistake of fact is less culpable because of the absence of mens rea. With regard to government conduct vis-à-vis constitutional rights,

29

we cannot find any support, in any setting, for the proposition that a government agent's mistake of law might be excusable while a mistake of fact would not. For example, in <u>Montanez v. Thompson</u>, 603 F.3d 243, 250 (3d Cir. 2010), we recently noted that qualified immunity applies regardless of whether a government official's conduct stemmed from a mistake of law or a mistake of fact. In <u>Curley v. Klem</u>, 499 F.3d 199, 215 (3d Cir. 2007), we held that a police officer's reasonable mistake of fact in shooting the wrong person meant that no constitutional violation had occurred, and thus obviated the need for the court to continue to the question of whether the officer had committed a mistake of law for qualified immunity purposes. In the Fourth Amendment suppression context—logically analogous to the suppression remedy provided in § 2518(8)(a)—we have held that an officer's "reasonable mistake of fact does not violate the Fourth Amendment," whereas a mistake of law, even a reasonable one, might. <u>United States v. Delfin-Colina</u>, 464 F.3d 392, 398 (3d Cir. 2006) (internal quotation and citation omitted); <u>accord</u> <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 185 (1990) (noting that factual determinations made by government agents need not "always be correct," but they always have to be "reasonable"). Finally, our sister Courts of Appeals have had little difficulty extending <u>Ojeda Rios</u> to cover reasonable mistakes of fact. <u>See, e.g.</u>, <u>United States v. Coney</u>, 407 F.3d 871, 875 (7th Cir. 2005) (permitting a misunderstanding between attorneys as to who was supposed to seal tapes to constitute a satisfactory explanation for a 10-day delay); <u>see also</u> <u>United States v. Pitera</u>, 5 F.3d 624, 627 (2d Cir. 1993). We therefore find no problem in recognizing that a reasonable mistake of fact can suffice to establish a satisfactory explanation pursuant to § 2518.

30

Having concluded that a "mistake of fact" exception exists, we must next determine the contours of this exception and whether the government's conduct here fits within it. We hold that the reasonable mistake of fact analysis should mirror the reasonable mistake of law inquiry in <u>Carson</u>. <u>See</u> 969 F.2d at 1494. In <u>Carson</u>, we held that a mistake of law "is objectively reasonable only when the attorney involved acted as a 'reasonably prudent' attorney would to investigate the legal question involved in a reasonably prudent manner." <u>Id.</u> Thus, absent any indication of tampering, bad faith, or deliberate disregard for the requirements of Title III, we hold that an agent, acting as a reasonably prudent government agent would have, who has committed a reasonable mistake of fact may qualify for the "satisfactory explanation" exception.

Applying the rule to the facts here, although the district court in <u>Carson</u> made inadequate findings to determine whether the attorneys in that case had acted reasonably, we face no such difficulty. The District Court here found that the attorney here had knowledge of and fully intended to comply with the sealing requirement, and in fact, believed that she had done so. <u>See</u> Supp. App. 04663-04664. Indeed, it found that the delay was caused by a "reasonable mistake made in good faith" regarding the mechanics of the sealing process. Supp. App. 04664. The Court also found that none of the data on the sealed CDs had been altered or corrupted. These findings are not clearly erroneous, and demonstrate that the attorney here acted as a reasonably prudent attorney in her situation would have.

We therefore hold that the delays here were an excusable breach of the § 2518(8)(a) sealing requirement and do not warrant a retrial.

31

## V.

We next must determine whether the District Court violated Apprendi v. New Jersey, 530 U.S. 466 (2000), during sentencing. We conclude that no violation occurred, and we will affirm the District Court's judgment.

Bansal and Mullinix contend that the District Court committed an Apprendi violation when calculating the sentences for their convictions under Count One. They contend that the violation occurred when the District Court sentenced them pursuant to the Guidelines that apply to Schedule IV controlled substances even though (1) they were charged with conspiring to distribute Schedule II, III, and IV substances, and (2) the jury made no finding of fact as to which substances the two actually conspired to distribute. We will affirm their sentences.

Whether the District Court's sentence in this case contravened Apprendi is "a pure question of law over which we exercise plenary review." United States v. Barbosa, 271 F.3d 438, 452 (3d Cir. 2001); cf. United States v. Williams, 235 F.3d 858, 861 (3d Cir. 2000).

A federal statute classifies controlled substances according to five Schedules: Schedule I describes the most serious substances, and Schedule V describes the least serious. The sentencing range for distribution of controlled substances varies depending upon which Schedule describes the substance in question. In this case, Count One of Bansal and Mullinix's indictment alleged that they conspired to distribute 17 controlled substances, all of which fell into Schedule II,

III, or IV. At trial, the jury returned a general verdict of guilty under Count One, but did not identify which of the 17 substances it concluded were actually involved in the conspiracy. At sentencing, the District Court calculated Bansal and Mullinix's sentences according to 21 U.S.C. § 841(b)(2), which applies to Schedule IV controlled substances, the least culpable of the 17 substances described in Count One. Bansal and Mullinix objected that the District Court could not have determined that § 841(b)(2) and Schedule IV applied without making a finding of fact as to what drugs they actually conspired to distribute, and they alleged that any such finding violated their right to a jury trial as set forth in Apprendi. The District Court overruled the objection, and they appealed.

Bansal and Mullinix's contention is that because the jury in this case did not return a verdict specifying what drugs were involved, there was no way for the District Court to apply the provisions for Schedule IV drugs without engaging in fact-finding as to the drug or drugs involved. They contend that this fact-finding violated their Sixth Amendment right to a jury trial, because it increased the penalty for their crime beyond the statutory maximum for Schedule V controlled substances without a jury finding that Schedule IV controlled substances were actually involved. See Apprendi, 530 U.S. at 490. They rely primarily upon Barbosa, wherein we held that a district court violated Apprendi because it sentenced a defendant according to the Guidelines for cocaine trafficking, even though jury instructions resulted in a finding that the defendant had "trafficked in a controlled substance, without any finding as to a particular controlled substance or the amount at issue." 271 F.3d at 454. The defendant in Barbosa had carried into the country on an international flight what a laboratory later proved was cocaine, believing—and maintaining at

33

trial—that it was heroin. Id. at 444, 450. Upon his charge for trafficking in heroin and cocaine, the jury returned a guilty verdict that did not specify the drug involved. The district court sentenced the defendant according to the relatively harsher provisions for cocaine. See id. at 449. Our Court concluded that the absence of a jury finding as to the drug's type made it impossible for the trial judge to determine which Sentencing Guidelines applied to the defendant without fact-finding. See id. at 456-457, 459. Because the district court implicitly found a fact that had the effect of increasing the bottom end of the Barbosa's statutory range, an Apprendi violation occurred. Id. at 457. But we then went on to examine what effect, if any, a jury's finding would have had upon the sentence the district court actually imposed and we concluded that "irrespective of which of the two drugs the jury could have found, Barbosa's twenty-year sentence falls [above the statutory minimum for both drugs and] well below the prescribed statutory maximum of life for either heroin or cocaine base." Id. at 460. Because the jury could only have found one of two drugs—cocaine or heroin—and because the sentence Barbosa received was appropriate for either drug, we concluded that the Apprendi violation in his case was a harmless error and affirmed his sentence. Id.

Bansal and Mullinix's position is that—like in Barbosa—the jury did not specify the drug they were accused of distributing. They contend that as a result the District Court could not know which Schedule to apply unless it engaged in its own fact-finding, thereby committing an Apprendi violation. They urge us to vacate their sentences and remand for a new trial on the issue. The government responds that, like Barbosa, the jury's choice in this case was limited to a finite set of controlled substances, any of which would support the

34

Appellants' sentences. It points out that Count One of the indictment charged the Appellants with conspiring to distribute Schedule II, III, and IV controlled substances, and went on to list 17 different substances the defendants had agreed to distribute. Because the District Court sentenced the Appellants pursuant to the provisions providing for Schedule IV substances (which carry the least culpability), the government contends that even if the jury had identified which of the 17 substances were actually involved, a more lenient provision of the Sentencing Guidelines still could not have applied. It therefore urges us to hold that any Apprendi violation in this case was harmless error.

We agree with the government. An Apprendi violation occurs if a district court makes a finding of fact that "increases the penalty for a crime beyond the prescribed statutory maximum." 530 U.S. at 490. The 17 drugs Bansal and Mullinix were indicted with conspiring to distribute ranged from Schedule II to Schedule IV substances, but the sentences that the two received were based only upon the guidelines applicable to Schedule IV substances. The sentences, therefore, were based upon the lowest conceivable liability under the indictment. To the degree the District Court found any facts as to what substances were involved in the conspiracy, the finding did not increase the penalty for their crimes because it represented the lowest possible sentencing range compatible with the jury's verdict. We therefore hold that any Apprendi violation was harmless. We will affirm the sentences Bansal and Mullinix received for their convictions under Count One.

VI.

35

Of the remaining joint contentions, Appellants challenge their conspiracy convictions under Counts One and Two of their indictment on the ground that the underlying conduct the government alleged, distribution of controlled substances via the internet, was not illegal at the time they were charged. They then challenge their money laundering convictions on the related ground that they obtained the money laundered by lawful means. Finally, they contend their convictions under Count One were misdemeanors and not felonies. We will affirm the District Court's conclusion in all respects.

A.

Bansal and Mullinix challenge their convictions for (1) conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846; (2) conspiracy to import controlled substances in violation of 21 U.S.C. § 963; and (3) illicit money transfers and laundering in violation of 18 U.S.C §§ 1956 and 1957, on the ground that their conduct—distributing controlled substances via the internet—was not illegal when they were indicted. The cornerstone of their position is that controlled substance distribution via the internet could not have been illegal in 2006 because the relevant statute did not expressly address the internet until 2008. We disagree.

We exercise plenary review over a challenge to the sufficiency of an indictment. See United States v. Whited, 311 F.3d 259, 262 (3d Cir. 2002).

The predicate felonies alleged in the conspiracy charges under Counts One and Two were distribution and importation of controlled substances in violation of § 841(a).

36

These also were the "specified unlawful activit[ies]" that formed the basis for the money laundering charges under § 1956. Section 841(a), which is unchanged since 2006, provides:

> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
>
> (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
>
> (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

21 U.S.C. § 841(a). An exception to this blanket prohibition permits physicians or other authorized health professionals to distribute controlled substances pursuant to a prescription. See 21 U.S.C. § 829. The Code of Federal Regulations further provides that every "prescription for a controlled substance . . . must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04. Any distribution of a controlled substance pursuant to a prescription that does not meet this standard is a criminal violation of § 841.

Bansal and Mullinix contend that their convictions for conspiracy to distribute controlled substances are invalid because their conduct did not violate § 841. They rely primarily upon the Ryan Haight Online Pharmacy Consumer Protection

Act ("the Ryan Haight Act"), which in 2008, imposed direct federal regulation upon online pharmacies. See Pub. L. No. 110-425, 122 Stat. 4820. The Ryan Haight Act sought to expand the Controlled Substances Act, the statute under which Bansal and Mullinix were convicted, by expressly regulating distribution of controlled substances over the internet. It does so by defining a valid doctor-patient relationship and providing "statutory clarification" to the law surrounding internet controlled-substance sales. See App. 59 (Senate Hearing Transcription). Relying upon statements by various senators and by then-Attorney General Alberto Gonzales, Bansal and Mullinix contend that because the word "internet" was not added to the Controlled Substances Act until 2008, their internet-based conduct must have been legal when they were indicted in 2006. They contend that any application to this case of the Ryan Haight Act's prohibition of internet drug sales is therefore ex post facto and unconstitutional. Their fallback position is that even if the 2006 version of § 841 could be read to apply to online pharmacies, such a reading would be open to interpretation and debate, thereby rendering it unconstitutionally vague—at least as applied to pre-2008 online pharmacy operations.

The government responds that § 841 clearly and unambiguously applied to Bansal and Mullinix's online operations in 2006. In support of its contention that Bansal and Mullinix could be prosecuted under the pre-Ryan Haight Act version of the statute, it cites United States v. Moore, 423 U.S. 122, 124 (1975) (holding that physicians may be prosecuted under § 841 if they distribute medication "outside the usual course of professional practice"), as well as cases from federal courts across the country holding that § 841 applied to controlled substance distributions by online pharmacies even

before Congress enacted the Ryan Haight Act amendments, e.g., United States v. Birbragher, 603 F.3d 478, 484-490 (8th Cir. 2010); United States v. Lovern, 590 F.3d 1095, 1103 (10th Cir. 2009); United States v. Quinones, 536 F. Supp. 2d 267, 268-271 (E.D.N.Y. 2008), aff'd 635 F.3d 590 (2d Cir. 2011). The government's position is that, because the pre-Ryan Haight Act version of § 841(a) applied to all distributions of controlled substances, Bansal's and Mullinix's convictions were not an ex post facto application of the Ryan Haight Act.

We agree with the government. Strictly speaking, Bansal and Mullinix were not charged with distributing controlled substances via the internet; they were charged with distributing controlled substances, period. Their conduct—prescription-less sales of controlled substances—fell squarely within § 841(a)'s blanket statement that "it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," and does not qualify for the exception that § 849 affords to sales in the usual course of medical business pursuant to valid prescriptions. We find this text abundantly clear: it was illegal in 2006 to sell controlled substances without a valid prescription. That the Ryan Haight Act later criminalized the precise machinery by which they effected their illegal transactions does not alter the basic fact that they were selling controlled substances without prescriptions. We therefore conclude that Bansal and Mullinix were properly indicted and convicted under § 841(a).

B.

39

Bansal and Mullinix contend that their money-laundering convictions are invalid because they laundered from lawful sources—i.e., because it was legal in 2006 to sell controlled substances over the internet without prescriptions. As explained above, prescription-less sales of controlled substances were illegal when the Appellants were indicted, regardless whether the sale took place online. Consequently, we will affirm the District Court.

Whether the money a defendant has laundered represents the "proceeds" of "specified unlawful activity" under 18 U.S.C. § 1956(c)(7) is a question of law we review de novo. Cf. United States v. Yusuf, 536 F.3d 178, 185 (3d Cir. 2008).

A person is guilty of money laundering under 18 U.S.C §§ 1956 and 1957 if, with the intent to commit a crime, he conducts a financial transaction designed in whole or in part to conceal the source, ownership, or control of "the proceeds of specified unlawful activity." The statute then sets forth a list of "specified unlawful activit[ies]." Id. § 1956(c)(7). Importantly, a person commits money laundering only if the laundered money is "proceeds" from at least one of the criminal activities specified in § 1956(c)(7).

Appellants contend that their money laundering convictions are invalid because the government did not prove that the money involved was proceeds from a "specified unlawful activity." They insist that their underlying conduct was the "sale of pharmacy medication," which is not listed in § 1956(c)(7). The government responds that the "proceeds" were generated by felonies enumerated in § 1956(c)(7). It points out that § 1956(c)(7)(A) includes any "offense listed in

40

section 1961(1) of Title 18." Subsection D of 18 U.S.C. § 1961(1) includes "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance . . . (as defined in section 102 of the Controlled Substances Act)." The government contends that the money laundering in this case involved the proceeds of Bansal and Mullinix's distribution of prescription drugs without prescriptions. In the government's view, the laundered money was therefore proceeds of felonious activity described in § 1961(1), which § 1956(c)(7) incorporates in full.

We agree with the government. The evidence at trial established that Bansal and Mullinix committed felony violations of the Controlled Substances Act. Their conduct included "the distribution of, and conspiracy to distribute, controlled substances," which—by way of § 1956(c)(7)'s incorporation of § 1961(1)—is an "enumerated felony" for the purposes of money laundering. We therefore will not disturb the jury's verdict.

## C.

Bansal and Mullinix contend that their convictions under Count One were misdemeanors and not felonies—a conclusion that, if correct, might (1) undermine their money laundering convictions (which require that proceeds be from specified "felonies"), (2) alter their Sentencing Guideline calculations, or (3) bear upon the mutual understanding of the defendants and the government in executing their forfeiture agreement. We need not address these issues in detail, however, because Bansal and Mullinix are wrong; their convictions under Count One are indeed felonies.

41

Whether a crime is a felony or misdemeanor is a question of law we review de novo. Biskupski v. Att'y Gen., 503 F.3d 274, 279 (3d Cir. 2007) (stating that "issues of statutory construction are questions of law over which we exercise plenary review" while examining the felony and misdemeanor classifications set forth in 18 U.S.C. § 3559(a)).

The United States Code classifies crimes according to the maximum possible sentence the crime can receive. It provides that offenses punishable by more than one year imprisonment (or by death) are felonies, and offenses punishable by no more than one year are either misdemeanors or infractions. See 18 U.S.C. § 3559(a)(5)-(6), (9). Federal statutes further provide that the maximum sentence for distribution of a Schedule IV controlled substance is five years, plus fines. See 21 U.S.C. § 841(b)(2). Schedule III substances carry a maximum sentence of 15 years, see § 841(b)(1)(E), and Schedule II substances carry a maximum sentence of life imprisonment, see § 841(b)(1)(C). Because the maximum sentence for each of these crimes is greater than one year, any distribution of a Schedule II, III, or IV substance is a felony.

Bansal and Mullinix were charged and convicted of conspiracy to distribute Schedule II, III, and IV controlled substances, all of which carry maximum sentences greater than one year of imprisonment. Further, Bansal and Mullinix actually received sentences greater than one year. Their convictions clearly are felonies. We therefore reject all of the Appellants' arguments that require us to accept as a premise that their convictions under Count One were misdemeanors.[5]

---

[5] Mullinix relatedly contends that his forfeiture agreement is invalid because he and the government mutually mistook the

42

VII.

Bansal argues for reversal on several matters that relate only to his appeal. Bansal first raises several issues pertaining to the sufficiency of his indictment, the grand jury procedures in his case, and the voir dire procedures in empanelling his jury. Second, Bansal challenges the scope and sufficiency of the warrants by which evidence against him was obtained. Third, he challenges the sufficiency of the evidence supporting the jury's verdict of guilty with respect to his controlled substance distribution and importation charges. Fourth, he contends various items of evidence were admitted against him in violation of the Sixth Amendment's Confrontation Clause and the Federal Rules of Evidence. Fifth, he contends that various jury instructions misstated the law or directed a verdict for the prosecution. Finally, he alleges that prosecutorial misconduct and Brady violations mandate a new trial. We conclude, for the reasons that follow, that all of these contentions are without merit. We therefore will affirm the District Court.

A.

---

charges in Count One for felonies when they were misdemeanors. The only mistake in this connection is Mullinix's apparent belief that the charges were misdemeanors. They were not. See 18 U.S.C. § 3559(a). At any rate, that mistake was not mutual. The government was well aware—and made abundantly clear to Mullinix—that he faced felony charges under Count One. We will therefore not disturb the forfeiture agreement.

Bansal contends first that his grand jury proceedings were tainted by the presence of an allegedly improperly appointed Special Assistant United States Attorney. We reject that claim because any error he created in the grand jury's finding was cured by Bansal's later conviction on all Counts by the petit jury. Second, Bansal contends that prosecutors made material misstatements and elicited false testimony at his grand jury proceedings. We reject this contention on the same ground: any alleged misstatements by prosecutors during the grand jury proceedings were cured by the petit jury's verdict of guilty on all Counts. Third, Bansal contends that his indictment for engaging in a CCE insufficiently stated the elements of the offense because the CCE Count did not allege with particularity three predicate felonies upon which a valid CCE charge must rely. We reject this contention because Bansal misunderstands the law: when seeking a CCE conviction, the government must allege at least three predicate felonies, but they need only be alleged within the indictment taken as a whole. Finally, Bansal contends that he is entitled to a new trial because portions of the District Court's voir dire procedures effectively closed his trial to the press and public. Because we conclude that Bansal waived this objection and that the District Court did not actually bar access to his voir dire procedures at any time, we will not order a new trial. We will affirm the District Court on each of these issues.

1.

Bansal did not challenge in the District Court the grand jury proceedings in his case. The issue likely is waived in its entirety. See Rule 12(b)(3), Federal Rules of Criminal Procedure (setting forth objections that "must" be raised prior to trial). Assuming we reached the question, we would review

44

Bansal's claim for plain error only, because "a guilty verdict by a petit jury remedies any possible defects in the grand jury indictment." United States v. Eltayib, 88 F.3d 157, 173 (2d Cir. 1996) (citing United States v. Mechanik, 475 U.S. 66, 70 (1986)).

Bansal contends that the participation of James R. Pavlock in the grand jury proceedings warrants the dismissal of the indictment. United States Attorney Patrick Meehan appointed Pavlock, pursuant to 28 U.S.C. § 543, to serve as a Special Assistant United States Attorney in this case. Pavlock then participated in the grand jury proceedings. Bansal contends that the appointment was invalid because Meehan did not have statutory authority to make the appointment.

We reject Bansal's contentions—raised for the first time on appeal—for three reasons. First, Bansal has waived his right to challenge the sufficiency of his indictment. Rule 12(b)(3) provides that objections based upon defects in an indictment, other than those attacking jurisdiction or alleging that the indictment fails to charge an offense, "must be raised before trial" or are otherwise waived. Bansal's contention is therefore untimely. See United States v. Coppola, 526 F.2d 764, 772-773 (10th Cir. 1975) (holding that a defendant's failure to object before trial to the presence of a "special attorney" before the grand jury was waiver of the issue). Second, to the degree Pavlock's presence improperly affected the grand jury's conclusions as to probable cause, any error was cured by the petit jury's verdict of "guilty" on all counts charged in the indictment. See Mechanik, 475 U.S. at 70 ("[T]he petit jury's verdict rendered harmless any conceivable error in the charging decision" of the grand jury, which may have been affected by improper persons at the proceeding).

For both of these reasons—waiver and cure—we will not reach the merits of Bansal's argument as to Pavlock.

2.

Bansal contends that his prosecutors committed misconduct during the grand jury proceedings, either by making misstatements of fact to the grand jury or by eliciting false testimony. We disagree.

We exercise plenary review over the District Court's legal conclusions. United States v. Nolan-Cooper, 155 F.3d 221, 229 (3d Cir. 1998).

Bansal and the government quibble as to whether the other side has misrepresented the record of testimony before the grand jury. We will not enter the fray. Because dismissal of an indictment is "the most drastic remedy," United States v. Morrison, 449 U.S. 361, 365 n.2 (1981), a defendant who seeks to set aside an indictment must show that misstatements to a grand jury caused actual prejudice to the defendant, see Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988). We agree with the government that Bansal cannot make that showing here. In this case, the grand jury found that there was probable cause to indict him on multiple counts for multiple crimes. A petit jury later returned a verdict finding beyond a reasonable doubt that he was guilty under all of those counts. Even if it were true that prosecutors made material misstatements to the grand jury, each of the grand jury's findings of probable cause was later ratified in full by the petit jury, thus curing the defects Bansal now alleges. See United States v. Console, 13 F.3d 641, 672 (3d Cir. 1993)

46

(holding that a petit jury's guilty verdict renders "any prosecutorial misconduct before the indicting grand jury harmless" as a matter of law). We therefore reject Bansal's contentions in this vein.

3.

Bansal requests a new trial on the ground that the District Court improperly limited public and press access to the pretrial jury selection procedures. We will not order a new trial because we do not that agree the District Court improperly closed the courtroom.

Because Bansal did not object to the voir dire procedures at his trial, we review his challenges on appeal for plain error only. United States v. Albertson, 645 F.3d 191, 196 (3d Cir. 2011).

The District Court conducted voir dire in this case according to the following procedures. First, prospective jurors were screened based upon their responses to general questioning in open court. Then, members of the voir dire panel were individually questioned about more sensitive subjects—in the presence of the defendants and attorneys for both sides—in a closed jury room adjacent to the courtroom. Neither party objected to these procedures at that time.

Bansal contends that the closed-room questioning violated the Sixth Amendment's public trial guarantee. We disagree for several reasons. First, this is classic sandbagging of the trial judge, as Bansal complains for the first time on appeal about a decision by the trial court to which he did not object at the time. Second, at no time did anyone—Bansal, the

47

press, or the public—request access to the closed jury-room. At most, the judge prevented the members of the voir dire panel from hearing other members' responses, and we are aware of no case holding that such procedures offend the Sixth Amendment. Third, to the extent Bansal complains about the right of the *press* to access his entire voir dire proceedings, Bansal likely lacks standing to challenge the District Court's action on the media's behalf. See, e.g., Press-Enter. v. Superior Court, 464 U.S. 501, 505-506 (1984) (noting that the press has a longstanding right to access criminal voir dire proceedings); United States v. Hitt, 473 F.3d 146, 155 (5th Cir. 2006) (holding that a failure to object to closed-questioning waives any right to a public trial the defendant may have asserted). Finally, the entire jury selection process was transcribed and recorded; nothing was sealed or concealed from public view. Given these facts, we will not order Bansal a new trial on these grounds.

## B.

Bansal's pro se brief alleges nine constitutional defects surrounding the search warrants and warrant application procedures in this case. Bansal goes on to assert that the District Court should have suppressed three categories of evidence: information obtained from the internet service providers that managed his email accounts, items obtained during the search of a garage in New York, and items obtained from his vehicle pursuant to his arrest. Because we conclude that none of this evidence was tainted by a constitutional violation, we will affirm the District Court's denial of Bansal's suppression motions.

48

We review a district court's denial of a motion to suppress for clear error as to the underlying factual findings, and we exercise plenary review of its application of the law to those facts. See United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002).

1.

Five Magistrate Judges, sitting for the Eastern District of Pennsylvania, granted requests by agents of the Drug Enforcement Administration ("DEA") for warrants authorizing a search for, and seizure of, information believed to be contained in Bansal's Gmail and MSN hotmail email accounts. The agents obtained the warrants and found what they were looking for. Bansal moved to suppress the evidence, and the District Court denied his motion. We will affirm.

First, Bansal contends that the Pennsylvania Magistrate Judges who issued the warrants lacked jurisdiction to do so because the warrants were ultimately executed upon internet service providers in California. We disagree. The procedures that federal and state law enforcement officers must follow when compelling disclosure from network service providers is set forth at 18 U.S.C. § 2703(a). The version of the statute in effect when these warrants were issued in 2004 authorized any "court with jurisdiction over the offense under investigation" to issue a warrant for electronic communications—even if the warrants were ultimately executed in another state. See § 2703(a). Bansal contends that Rule 41(b), which limits a Magistrate Judge's jurisdiction to the District in which he or she sits, trumps § 2703(a). We, along with other courts to consider the question, reject that contention. E.g., United States v. Berkos, 543 F.3d 392, 396-398 (7th Cir.

2008) (holding that Rule 41(b) "does not apply to § 2703(a)"). We therefore conclude that the Pennsylvania Magistrate Judges had authority to issue the warrants in this case, even though they were ultimately executed in California.

Second, Bansal contends that the warrants authorizing searches of his email accounts were unconstitutional general warrants. We disagree. The United States Constitution requires that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The warrants in this case met that requirement. They particularly described several categories of records: information on accounts, billing, payment, and "stored electronic information or files" associated with Bansal's email accounts. Supp. App. 04847. In short, these were not general warrants.

Third, Bansal contends that the warrants for the search of his email accounts were invalid because they lacked probable cause. We disagree. The Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. Such oath or affirmation is generally provided in the form of a sworn affidavit attached to the search warrant application. This was the procedure used in Bansal's case. Our review of the warrant application, see Supp. App. 04849-04857, reveals nine single-spaced pages of sworn statements from DEA Agent Eric M. Russ detailing his investigation, surveillance, and monitoring of Bansal's controlled substance distribution operation. The affidavit more than sufficiently establishes probable cause to believe Bansal's email accounts contained evidence of his in-

50

ternet-based illegal controlled substance distribution operation.

Fourth, Bansal contends that evidence obtained from his email accounts should have been suppressed on ground that the agents executing the warrants failed to adhere to the "notice requirements" imposed by Rule 41 because the executing agents did not provide him with a copy of the warrants. Rule 41 requires that searching officers put searched persons on notice of any property seized:

> The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property.

Rule 41(f)(1)(C). The plain text of Rule 41 thus requires notice only "to the person from whom, *or* from whose premises, the property was taken." Id. (emphasis added). Because Bansal does not deny that the warrant was provided to the internet service providers upon whom the search warrants were executed, we conclude that notice was properly made in this case. We will therefore affirm the District Court.

2.

Bansal contends that the approximately 450 gallons of controlled substances found in a garage in Point Lookout, New York, should not have been admitted at his trial because they were seized in violation of the Fourth Amendment. We disagree.

51

In 2005 a federal Magistrate Judge sitting for the Eastern District of New York approved a search warrant for a house described as "the premises known and described as 23 Garden City Avenue[,] Point Lookout, New York." Supp. App. 04286-04245. When DEA agents executed the warrant, they discovered—contrary to their expectation—that the garage was not attached to the house. Wanting to search the garage, they telephoned the Assistant United States Attorney assigned to the case, who told the agents that the garage was within the scope of the warrant. Inside the garage, agents found and seized ten 45-gallon plastic containers filled with controlled substances, some of which were packaged for delivery to customers. Bansal moved to suppress the evidence on the grounds that (1) the garage was not part of the "premises" at 23 Garden City Avenue, and (2) the agents had not acted in good faith in searching the garage. The District Court concluded as a matter of fact that the garage was part of the curtilage of the residence at 23 Garden Avenue and as a matter of law that the agents acted in good faith.

Bansal reargues on appeal that the garage was not within the curtilage and that the agents' reliance upon an interested prosecutor's telephone advice is not sufficient to establish a good faith defense. We will not reach the good faith inquiry because we conclude that the warrant authorized the search of the garage. First, the warrant was not limited only to a search of the home at 23 Garden Avenue. It authorized a search of the entire "premises," which included the garage. Second, we are puzzled as to how Bansal's case is advanced by his assertion that the garage was outside the curtilage of the home at 23 Garden Avenue. It is axiomatic that "[a] person's curtilage is the area immediately adjacent to his home

52

in which he has a legitimate expectation of privacy." Estate of Smith v. Marasco, 430 F.3d 140, 156 n.14 (3d Cir. 2005) (citing United States v. Dunn, 480 U.S. 294, 300 (1987)). We are puzzled because Bansal's contention that the garage was outside the curtilage actually decreases his legitimate expectation of privacy in the building, and presumably places it merely on the "premises" at 23 Garden Avenue, squarely within the terms of the search warrant. In sum, we conclude that if the garage was within the curtilage, as the District Court found, then for Fourth Amendment purposes it was part of the premises at 23 Garden Avenue (the search of which no party disputes was authorized); if it was instead beyond the curtilage, Bansal's expectation of privacy was diminished to the point that no violation could have occurred.

At bottom, we find the curtilage and good faith contentions ancillary to the validity of the search in this case. We conclude that the plain text of the warrant authorized the search of the garage at 23 Garden Avenue, and we will affirm the District Court's denial of Bansal's motion to suppress.

3.

Bansal contends that a laptop computer, compact discs, and computer thumb drives seized during the search of his car when he was arrested were obtained in violation of the Fourth Amendment, and thus should not have been admitted at his trial. We disagree.

After realizing that DEA agents were about to arrest him, Bansal attempted to flee the country at 1:30 in the morning of April 19, 2005. FBI agents were conducting surveillance of his apartment at the time because they planned to ex-

ecute a search warrant at 6:00 that morning. Realizing that Bansal was about to flee, the FBI agents stopped his vehicle and arrested him. DEA agents then arrived at the scene. Knowing that Bansal's vehicle was under a forfeiture order, and thus subject to impoundment pursuant to Bansal's already issued indictment, the DEA agent began an inventory search. Prosecutors later offered various items the agents had discovered, some of which they found in closed containers, as evidence at Bansal's trial. Bansal filed a motion to suppress, which the District Court denied on the ground that the search was a proper inventory search, a proper search incident to valid arrest, or a proper search pursuant to the automobile exception.

We agree that the search was a proper inventory search and do not address the search-incident-to-arrest exception or the automobile exception. The search was a proper inventory search because the forfeiture order authorized agents to take custody of the car. After taking custody of property, officers may make a warrantless inventory search so long as the search is conducted pursuant to standardized procedures. See South Dakota v. Opperman, 428 U.S. 364, 369 (1976). Such a search may extend to closed containers. See Illinois v. Lafayette, 462 U.S. 640, 648 (1983).

The District Court took testimony and issued a finding of fact that the search of Bansal's car was conducted pursuant to standardized DEA procedures. Bansal has not adduced any evidence indicating that the District Court's factual finding, which it based upon testimony it deemed credible, was clear error. Further, even if the search did violate DEA procedures in some way, any evidence obtained from Bansal's car at the scene eventually would have been discovered pursuant to im-

54

poundment under the forfeiture order. This places this case squarely within the "inevitable discovery rule." See Nix v. Williams, 467 U.S. 431, 443-444 (1984). Accordingly, we hold that evidence obtained from Bansal's car therefore was not tainted by an unconstitutional search. We will affirm the District Court.[6]

C.

Bansal was convicted of various conspiracy charges, set forth in Counts One, Two, Three, Four, and Five of his indictment. He contends that the government produced insufficient evidence at trial for a jury to find beyond a reasonable doubt that he was guilty of each of the crimes. We disagree.

---

[6] Bansal also challenges warrants issued by Eastern District of Pennsylvania Magistrate Judges authorizing two wiretaps of his email accounts. These also were executed in California. He contends first that the Magistrate Judges in this case lacked jurisdiction to issue warrants outside the Eastern District of Pennsylvania—a contention we have already rejected. He contends also that the intercepted emails should be suppressed because the warrants were not supported by probable cause. We disagree. The wiretaps of Bansal's email accounts were authorized by two warrants, which are reproduced at pages 04136-04210 of the Supplemental Appendix. These 74 pages, almost all of which represent the affidavit of probable cause, spell out in great detail why there was probable cause to believe that Bansal's email accounts contained evidence of illegal controlled substance distribution. We are satisfied, without restating that record here, that they more than sufficiently established probable cause to support the warrants.

We apply a particularly deferential standard of review when deciding whether a jury verdict rests on sufficient evidence. "It is not for us to weigh the evidence or to determine the credibility of the witnesses." United States v. Voigt, 89 F.3d 1050, 1080 (3d Cir. 1996) (citation omitted). We must view the evidence in the light most favorable to the government, see United States v. Thomas, 114 F.3d 403, 405 (3d Cir. 1997), and we will sustain the verdict if "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Voigt, 89 F.3d at 1080 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

1.

Bansal contends that his convictions under Counts One and Two of his indictment, alleging conspiracy to distribute and conspiracy to import controlled substances in violation of 21 U.S.C. § 846, were not supported by evidence sufficient to sustain the jury's verdict. We disagree.

In United States v. Iglesias, 535 F.3d 150, 156 (3d Cir. 2008), we stated that to obtain a conviction under § 846, the government must establish: (1) a unity of purpose, (2) an intent to achieve a common goal, and (3) an agreement to work toward the goal.

The government may prove the existence of the above elements by circumstantial evidence. See United States v. Applewhaite, 195 F.3d 679, 684 (3d Cir. 1999). Further, in examining the circumstantial evidence relevant to the above elements, we "must view the evidence in the light most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of

56

a crime beyond a reasonable doubt." United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998) (internal quotations and citations omitted).

Here, we have no difficulty concluding the government carried its burden. The jury received evidence that the defendants knowingly distributed, without prescriptions, controlled substances that were imported from India. See, e.g., Supp. App. 00104-00111 (testimony from a DEA agent explaining how customers purchased controlled substances from Bansal's website); id. at 01309-01310 (emails from coconspirator stating "we" ship from India, and process packages in the United States); id. at 01874-01875 (testimony by coconspirator as to how "we" set up and managed websites). From this evidence, a rational trier of fact could have found a unity of purpose, intent to achieve a common goal, and agreement to work toward that common goal. In short, the evidence readily supports the jury's conclusion that the defendants conspired to carry out the acts that they did in fact carry out together. We will not disturb the jury's verdict.[7]

2.

---

[7] Counts Three, Four, and Five of Bansal's indictment also represented conspiracy charges. Although Bansal's brief purports to challenge the evidentiary sufficiency for "all" of his conspiracy convictions, his brief addresses only Counts One and Two. To the extent that his evidentiary challenge to his convictions under Counts Three, Four, and Five are indeed before this Court, we conclude that Bansal—having not asserted any argument on his behalf—has not carried the "very heavy burden" of demonstrating insufficient evidence. Dent, 149 F.3d at 187. We will affirm the convictions.

Bansal, who under Count Four of his indictment was convicted of conspiracy to commit felony misbranding of drugs, contends that the government failed to prove he misbranded drugs with intent to defraud. If true, the failure would reduce his crime from a felony to a misdemeanor. We disagree with Bansal's contention, however, and will affirm his felony conviction. Bansal was convicted of conspiring to distribute misbranded prescription drugs, in violation of 21 U.S.C. § 331(a). This offense is a felony if committed "with the intent to defraud or mislead." Id. § 333(a)(2). Bansal contends that the government failed to produce evidence sufficient to support the jury's finding that he committed the offense with intent to defraud. He is wrong. The jury received evidence that Bansal was aware that he was distributing misbranded controlled substances that ordinarily would require a prescription, see Supp. App. 00197, 00911, 01277-01278, and that he had commented that his customers' lack of prescriptions was cause for concern, see Supp. App. 00911. Yet he continued to represent falsely to customers that either no prescriptions were necessary or that his business would provide prescriptions, see Supp. App. 01277, and he continued to distribute controlled substances to customers after making such assurances, see Supp. App. 01280. From this evidence, the jury could have concluded that Bansal's misrepresentations of customers' liability evidenced an intent to fraudulently induce them into making prescription-less purchases. That conclusion, based upon permissible inferences from evidence the jury received, is sufficient to support its finding that he distributed misbranded medication with intent to defraud.

D.

58

Bansal contends that various items of evidence were admitted against him in violation of the Sixth Amendment's Confrontation Clause or in violation of the Federal Rules of Evidence. We disagree and will affirm each of the District Court's rulings.

"We review the District Court's decisions as to the admissibility of evidence for abuse of discretion." United States v. Serafini, 233 F.3d 758, 768 n.14 (3d Cir. 2000) (citing United States v. Pelullo, 964 F.2d 193, 199 (3d Cir. 1992)). "To the extent that these rulings were based on an interpretation of the Federal Rules of Evidence, however, our review is plenary." Id.

1.

During Bansal's trial, the District Court permitted records kept by domestic and foreign businesses to be admitted, subject to authentication by declarations of record custodians pursuant to Rule 803(6) Federal Rule of Evidence and 18 U.S.C. § 3505(a)(1). Bansal claims first that these records contained testimonial hearsay and their admission violated his Sixth Amendment right to confrontation; and second, that various exhibits lacked foundation to qualify as business records. We disagree on both points.

Rule 803(6) creates a hearsay exception for business records that: "(1) Were made at or near the time of the event the record describes; (2) Were made by a person with knowledge of the record's contents; (3) Were kept in the regular course of business."

Rule 803(6) further provides that the above prerequisites may be established by the testimony of a record custodian, either in person or by sworn declaration. Finally, § 3505(a)(1) provides that "foreign records of regularly conducted activity" (e.g., records kept by entities overseas) may be admitted according to essentially the same criteria.

First, the evidence to which Bansal claims a confrontation right were records from domestic and foreign banks, car dealerships, and other business entities. All were authenticated by sworn declarations of record custodians. See App. 00255-00384 (custodians' declarations). His primary contention is that the records contain testimonial statements, so he had a right to confront the documents' authors and custodians. We disagree, first, because the Supreme Court has indicated that business records are almost never "testimonial" for Confrontation Clauses purposes, see Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527, 2539-2540 (2009) ("Business and public records are generally admissible absent confrontation . . . ."), and because the statements in the records here were made for the purpose of documenting business activity, like car sales and account balances, and not for providing evidence to law enforcement or a jury.

Next, Bansal claims that certain excel spreadsheets that were attached to emails to and from his coconspirators should not have been admitted as business records. Bansal is correct that these spreadsheets do not qualify as business records. But they were not admitted as business records; they were admitted as coconspirator statements in furtherance of the conspiracy and as admissions of party opponents. See Supp. App. 00128-00190. Their admission on these grounds was proper.

Bansal claims that *all* of the government's bank check and wire-transfer exhibits were improperly admitted as business records, even though the trial court sustained his objection to their admission. But the objection that the trial judge sustained was to the admission of one particular record—not to every bank and wire transfer document. See Supp. App. 00298. The portions of that record to which Bansal objected were redacted. See Supp. App. 00298-00299. The remaining bank and wire transfer records to which Bansal now contends he objected were admissible business records.

Bansal also contends that IRS Special Agent Carp was incompetent to testify about domestic and international wire transfers in general. But Special Agent Carp testified about his personal examination of the bank and wire transfer records actually introduced at trial; his testimony did not turn on pontification about wire transfers in general. See Supp. App. 2793. Although there was some general discussion of wire transfers, that discussion came *after* general testimony about wire transfers from a fraud investigator, who was competent to render it. See Supp. App. 1437-1440. Special Agent Carp's testimony was admissible personal knowledge under Federal Rule of Evidence 602.

2.

The District Court admitted into evidence screenshots of Bansal's website, which included information about his online pharmacy operation. Bansal contends that these screenshots were not properly authenticated. We disagree. Rule 901(b)(1) requires that before evidence is admitted, its proponent must produce evidence "sufficient to support a

61

finding that it is what it purports to be." Testimony of a witness with personal knowledge is sufficient. Id. In this case, the government obtained the screenshot images from a company called the Internet Archive, which runs a website called the Wayback Machine. The Wayback Machine seeks to catalogue all websites on the internet and currently has a database spanning more than a decade. To authenticate that the screenshot was what it purported to be, the government called a witness to testify about how the Wayback Machine website works and how reliable its contents are. The witness also compared the screenshots with previously authenticated and admitted images from Bansal's website and concluded, based upon her personal knowledge, that the screenshots were authentic. This was evidence "sufficient to support a finding" that the screenshots were "what they purport[ed] to be," rendering them admissible under Rule 901(b)(1). Accordingly, we will affirm the District Court.

3.

Bansal contends that the District Court abused its discretion in admitting two summary exhibits, each of which was based upon spreadsheets and invoices that Bansal's organization had sent to various website operators. We find no abuse of discretion. Rule 1006 permits parties to use charts or other exhibits to summarize voluminous materials if a summary would be helpful to the jury. Decisions in this connection are committed to the sound discretion of the trial court, which in this context is very broad. See Pritchard v. Liggett & Myers Tobacco Co., 295 F.2d 292, 299 (3d Cir. 1961) ("[T]he use of a summary is a matter that rests within the sound discretion of the trial court."). Bansal objects first to Exhibit 837, which was a summary of the entire collection of invoices that

an analyst for the National Drug Intelligence Center had collected from website operators working with Bansal's operation. He also objects to Exhibit 838, which contained the same information as Exhibit 837 but included a column identifying what percentage of each website operator's revenues represented controlled substance sales. Both Exhibits were derived entirely from other exhibits that had been authenticated and admitted without objection by Bansal. Given the volume of documents each Exhibit summarized, we have no difficulty holding that the trial court was within its discretion when it concluded that summaries would be helpful to the jury. We will therefore affirm its decision to admit the Exhibits.[8]

## E.

Bansal's appeal raises numerous issues pertaining to the jury instructions. His various contentions are iterations of a single theme: that the District Court made statements that implicitly directed a verdict for the prosecution. This contention has no merit. We will affirm the District Court on all points.

---

[8] Bansal also makes a number of other challenges to the District Court's decisions to admit evidence, including contentions that it should not have admitted evidence of DEA and FDA guidelines pertaining to online sales of controlled substances, and that Summary Exhibit 1016—which was admitted under Rule 611(a)—should have been excluded because it did not qualify for admission under Rule 1006. Simply put, these contentions are meritless. We are content to affirm the District Court's decisions for the reasons it has stated on the record.

Bansal did not object to the jury instructions at his trial—consequently, we review his claim for plain error only. Albertson, 645 F.3d at 196; cf. Henderson v. Kibbe, 431 U.S. 145, 154 (1977) ("It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.").

Bansal contends, first, that when instructing on Count One, the District Court erred in stating, "You are instructed as a matter of law that [each of the drugs listed in the indictment] are controlled substances." Supp. App. 03377. In Bansal's view, this statement usurped the jury's role as fact-finder because it instructed a finding of fact on a material element of a crime. Contrary to Bansal's contention, however, each drug alleged in the indictment *was* a controlled substance, as a matter of law. Each substance is listed in Schedule II, III, or IV of the Controlled Substances Act, and the indictment defined the substances it listed as "controlled substances" within the meaning of that Act. There was no plain error.

Bansal also contends that the District Court erroneously defined "business enterprises involving narcotics" when charging the jury as to money laundering. The District Court, which essentially read the elements of the definition from 18 U.S.C. § 1852, committed no plain error.

Bansal contends that the District Court "implicitly instructed the defendant's guilt in several other jury instructions." Bansal Br. at 160. In particular, he points to the District Court's cautionary instruction regarding cooperating witnesses, see Supp. App. 03368-03369 ("I also caution you that you have heard testimony from persons having pled

64

guilty to charges arising out of similar facts of the case."), and its instruction to consider whether witnesses who have pleaded guilty have an incentive to lie, see id. We disagree with Bansal. Neither of these statements "instructs" the jury to find for the government, and similar statements have been approved by this Court. See United States v. Universal Rehab. Servs. (PA), Inc., 205 F.3d 657, 667 (3d Cir. 2000) (en banc).

Bansal contends that the District Court lowered the government's burden of proof by instructing jurors to "seek the truth" in Bansal's case. Bansal ignores, however, the Court's voluminous instructions as to what constitutes reasonable doubt, see Supp. App. 00432, the role of the jury in fact-finding, see id. at 00430, 00445, and which party to a criminal prosecution carries the burden of proof, see id. at 00430-00431. Given all of these instructions, we have difficulty understanding how the trial judge committed plain error by also telling jurors to "seek the truth."

Bansal also contends that the District Court's "willful blindness" instruction regarding deliberate indifference lowered the government's burden of proof. He contends first that the instruction should not have been given at all because it was not warranted by the evidence at trial. We disagree. Bansal's staunch denial of his knowledge of criminal activity in the face of overwhelming contrary evidence strongly suggests that he closed his eyes to what would otherwise have been obvious to him. He next contends that the District Court failed to identify which facts proved willful blindness. This contention misses the point because precise identification of the facts supporting the charge was exactly the decision the jury was being charged to make. Bansal also contends that the

65

Court failed to emphasize the subjective nature of willful blindness. Again, we disagree, because although the jury instruction did not use the word "subjective," it focused entirely upon how to determine a person's state of mind. See Supp. App. 03373-03374.

Finally, Bansal contends that the District Court misinstructed the jury on the elements of conspiracy and on the intent element of felony misbranding. He is wrong. The District Court's conspiracy instruction, which it set forth in great detail, see Supp. App. 00449, 00473-00475, and summarized as "an agreement or a mutual understanding knowingly made or knowingly entered into by two or more people to commit a crime by some joint or common plan or course of action," Supp. App. 00453, properly set forth the essential elements of conspiracy, which are: (1) a mutual agreement or understanding, (2) knowingly entered by the defendant, with (3) an intent to jointly commit a crime. See Third Circuit Model Jury Instruction 6.18.371A. Similarly, the District Court's instruction on the intent element of felony misbranding was proper. It stated that the jury "must also determine whether [Bansal] acted with intent to defraud and mislead in connection with the conspiracy to introduce drugs into interstate commerce," and then explained what type of evidence the jury could use to infer intent. Supp. App. 00470-00471. We are satisfied that these instructions, to which Bansal did not object at trial, were not plain error.

F.

Bansal's final category of contentions focuses on alleged prosecutorial misconduct and Brady violations, which

66

he contends warrant a new trial. The District Court considered and rejected these claims. We will affirm.

1.

Ordinarily, we review for abuse of discretion a district court's denial of a motion for new trial made on the basis of newly discovered evidence. See United States v. Pelullo, 14 F.3d 881, 886 (3d Cir. 1994) (citation omitted). A Brady claim, however, presents questions of law and fact. Accordingly, we conduct a de novo review of the District Court's conclusions of law and we review its findings of fact for clear error. See id.

Bansal contends that the District Court should have granted his motion for a new trial because prosecutors withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). We disagree. Under Brady and Federal Rule of Criminal Procedure 16, the government must disclose evidence that is (1) material to either guilt or punishment and (2) favorable to the accused. See United States v. Bagley, 473 U.S. 667, 674 (1985). A Brady violation occurs if the government does not turn over such evidence and its failure to do so causes prejudice to the defendant. See Strickler v. Greene, 527 U.S. 263, 281-282 (1999). Importantly, our "prejudice" inquiry turns not on whether the defendant would have received a different verdict had the evidence been produced, but upon "whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 289-290.

Bansal calls to our attention several alleged violations of the Brady rule. He contends that prosecutors should have

produced certain intercepted phone calls, emails, an indictment filed against his coconspirators in New York, proffer statements from one of his coconspirators, and impeachment evidence against one of his coconspirators. The District Court held a hearing, after which it determined that all of the above-described evidence either (1) had been produced, (2) had not been requested by Bansal even though he was aware of it, (3) was in Bansal's (and not the government's) possession, or (4) was not in any way favorable to Bansal. These conclusions, which are findings of fact, support the District Court's denial of Bansal's motion for a new trial. Even if Bansal were correct and the District Court reached each of these factual findings in error, we remain convinced that Bansal received "a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 289-290. For those reasons, we will affirm the District Court.

2.

Bansal moved in the District Court for a new trial on the ground that the government had intruded into the defense camp by intercepting telephone calls he made while incarcerated in a federal detention center. The District Court denied the motion, and we will affirm.

We review for abuse of discretion a District Court's denial of a motion for a new trial. See Hook v. Ernst & Young, 28 F.3d 366, 370 (3d Cir. 1994).

After Bansal was arrested, the government advised him that all telephone calls to and from the federal detention center where he was to be held would be monitored and recorded. And that is exactly what happened. Bansal contends

that certain calls between him and his attorney were privileged communications that the government was not entitled to hear. The District Court conducted a hearing on this issue, at which a Postal Inspector—who was not involved in the prosecution—testified that he screened all of Bansal's calls and personally verified that (1) no privileged communication between Bansal and his attorney was intercepted, and (2) none of the taped conversations were ever distributed to the prosecutors or agents involved with Bansal's case. Based on this evidence, which was uncontroverted, the District Court ruled that prosecutors did not access any privileged information, and denied Bansal's motion for a new trial. Its conclusion will be affirmed.[9]

## VIII.

We have considered all of the contentions made by the parties and we conclude no further discussion is necessary. We will AFFIRM the orders and decisions of the District Court in all respects.

---

[9] Bansal also challenges, for the first time, certain allegedly prejudicial prosecutorial statements made at trial, a claim we review for plain error because this issue was not raised in the District Court. See Albertson, 645 F.3d at 196. These contentions are so baseless—several of the allegedly prejudicial statements actually were recitations of the jury instructions that Bansal had already approved, see Supp. App. 03592-03593—that we will not restate them here. The District Court considered and rejected each of these issues in its denial of Bansal's motion for a new trial and we are content that there was no error, much less plain error, in its conclusions.